IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MARK T. MORRIS                                                    PLAINTIFF

v.                              Civil No. 14-5096

SHERIFF KELLEY CRADDUCK; and
NURSE DARLA WATSON                                               DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. § 1983. At all times relevant to the Complaint, Plaintiff was incarcerated in the Benton County Detention Center (BCDC). While at the BCDC, Plaintiff contends he was denied adequate medical care. Plaintiff sought treatment for a condition ultimately diagnosed as testicular inflammation (epididymo-orchitis) and a build up of fluid in his testicles (hydroceles). Once the urologist recommended surgery, Plaintiff maintains Defendants delayed too long before getting the surgery scheduled.

The case is before me on the Defendants' summary judgment motion (Doc. 93). Plaintiff has responded (Doc. 98) to the motion. The motion is ready for decision.

### 1.  Procedural History

On April 26, 2016, a hearing was held on the Defendants' first summary judgment motion (Doc. 65). At the conclusion of the hearing, it was apparent that it would be necessary to have the opinion of a urologist as to whether or not the delay in surgery adversely impacted the Plaintiff. It was determined that a settlement conference might prove helpful. One was scheduled and held on June 15, 2016. The case did not settle.

-1-

I concluded it would be appropriate to appoint counsel for Plaintiff due to the complexity of the case. Counsel was appointed by order (Doc. 84) entered on June 22, 2016. A transcript of the April 26, 2016, hearing was ordered and received on July 19, 2016 (Doc. 88).

On June 24, 2016, Defendants filed a motion (Doc. 85) to withdraw their first summary judgment motion (Doc. 65). The motion to withdraw was granted (Doc. 86). An order (Doc. 92) was entered setting forth new deadlines. Thereafter, Defendants filed the motion for summary judgment (Doc. 93) that is currently before the court.

## 2. Background

Plaintiff was booked into the BCDC on April 8, 2013. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) A-1 at 8.[1] He remained incarcerated until May 20, 2014, when he was transferred to the Arkansas Department of Correction (ADC). *Defts' Ex.* A-2 at 88. He was in pretrial status until February 13, 2014. *Id.* at 90.

After his arrest on Monday, April 8, 2013,[2] Plaintiff was taken to the Siloam Springs hospital. *Defts' Ex.* B at 16.[3] He had not yet been to a doctor about his medical condition but had an appointment scheduled for the following Monday he believed. *Id.* The swelling in his testicles had started two days before his arrest. *Id.* at 18. Plaintiff described the pain as being unbearable. *Id.* at 19.

---

[1] The page numbers used for *Defts' Exs.* A-1 to A-8 are to the jail file page number located in the center bottom of the page.

[2] Plaintiff testified he thought he was arrested on a Wednesday or Thursday but April 8, 2013, was a Monday.

[3] Exhibit B is the Plaintiff's deposition. Page citations are to the deposition page numbers and not the CM/ECF document and page number.

When he was seen at the emergency room, his main concern was the swelling of his scrotum, although he also stated he had pain in his chest wall. *Defts' Ex.* B at 17-18. The doctor there diagnosed Plaintiff as having a cyst or tumor. *Id.* at 19. Plaintiff was given Ibuprofen and released back into custody. *Id.*

As part of the booking procedure at the BCDC, a medical questionnaire was completed. *Defts' Ex.* A-2 at 20. Plaintiff complained of burning while urinating, pain in his genitals so severe that he had passed out, and back and neck issues. *Id.* at 20.

On April 9, 2013, notes in Plaintiff's medical file indicate he was complaining of pain and swelling in his testicles and seen by Dr. Lafferty, the jail doctor. *Defts' Ex.* A-4 at 153. A note was made that his testicles were moderately swollen. *Id.* A urinalysis was done that showed trace amounts of blood and protein. *Id.* Plaintiff was put on Cipro, an antibiotic, for seven days, Flagyl, a medication that eliminates bacteria and other organisms, for seven days, and Ibuprofen, for seven days. *Id.*

Plaintiff maintains he did not see Dr. Lafferty on April 9, 2013. However, the medical records indicate he was seen and Nurse Watson in her affidavit states that Plaintiff was seen by Dr. Lafferty. *Defts' Ex.* C at ¶ 3; *see also Transcript* (Doc. 88) at 22. Whether or not he was seen, Plaintiff does not deny that a urinalysis was done and he was prescribed antibiotics and Ibuprofen for pain relief. A second urinalysis was done on April 10, 2013. *Id.*

On April 23, 2013, the jail medical record indicates Plaintiff was complaining of chronic neck and back pain and swollen testicles. *Defts' Ex.* A-4 at 154. A note was made that the condition was better but not gone. *Id.* Dr. Lafferty ordered a testicular ultra sound, a urology referral, and prescribed Ibuprofen. *Id.* The ultrasound was scheduled for the next day. *Id.*

-3-

The diagnostic impression from the ultrasound was:

Bilateral epididymo-orchitis.[4]

Bilateral complex hydroceles[5] may be reactive although pyoceles[6] are considered, recommend clinical correlation. Complexity is greater involving the right hydrocele than the left.

*Defts' Ex.* A-2 at 34. According to Nurse Watson, the hydrocele was an accumulation of fluid around the testicle area. *Transcript* at 22.

On May 1, 2013, a referral sheet was completed referring Plaintiff to Dr. Hewitt, a urologist. *Defts' Ex.* A-2 at 42. On May 2, 2013, Plaintiff was seen by Dr. Hewitt who diagnosed Plaintiff with epididymitis.[7] *Defts' Ex.* A-4 at 154; *Defts' Ex.* C at ¶ 7. Dr. Hewitt prescribed an antibiotic, doxycycline, and continued the Plaintiff on Motrin. *Id.* Plaintiff was to return in two weeks. *Id.*

Plaintiff submitted a medical request complaining of testicular pain on May 14, 2013. *Defts' Ex.* C at ¶ 9. On May 16, 2013, Plaintiff was seen by Dr. Lafferty regarding an increase in pain due to a fall on the corner of his bed. *Defts' Ex.* A-5 at 161. Dr. Lafferty ordered Ultram[8] for pain and continued the prescription for Ibuprofen. *Id.* On May 19, 2013, nursing staff was

---

[4] Inflammation of the epididymis and testes. The epididymis is an elongated structure connected to the posterior surface of the testis. The epididymis transports, stores, and matures sperm. http://www.medilexicon.com/dictionary/29727 (accessed May 17, 2017). Orchitis is inflammation of the testis. http://www.medilexicon.com/dictionary/63169 (accessed May 17, 2017).

[5] A hydrocele is a collection of fluid in a cavity or pocket in the testis or along the spermatic cord. http://www.medilexicon.com/dictionary/41867 (accessed May 17, 2017).

[6] A pyocele is an accumulation of pus in the scrotum. http://www.medilexicon.com/dictionary/74360 (accessed May 17, 2017).

[7] Epididymitis is an inflammation of the epididymis. http://www.medilexicon.com/dictionary/29731 (accessed May 17, 2017).

[8] Ultram is the brand name for tramadol. Tramadol is used to relieve moderate to moderately severe pain. https://medlineplus.gov/druginfo/meds/a695011.html (accessed May 9, 2017).

AO72A
(Rev. 8/82)

called to the pod due to Plaintiff's complaints of debilitating pain in his testicles making ambulation not possible. *Defts' Ex.* A-4 at 155. Plaintiff was given Ibuprofen and tramadol. *Id.* A urinalysis was done and was negative. *Id.* at 156. Plaintiff was put on bed rest on an as needed basis. *Id.* The plan was for Plaintiff to keep his upcoming urology appointment. *Id.*

Plaintiff was next seen by Dr. Hewitt on May 21, 2013. *Defts' Ex.* A-2 at 41. Dr. Hewitt again prescribed doxycycline and Motrin. He also prescribed tramadol, a pain reliever. *Id.* Plaintiff was to return in a month. *Id.*

On May 29, 2013, Plaintiff requested bed rest in the morning and afternoon due to his medical issues. *Defts' Ex.* A-4 at 156. Plaintiff was put on bed rest for one-half hour in the morning and afternoon. *Id.* Nurse Watson notes that inmates are all on lock-down for two to three hours after lunch allowing Plaintiff to rest during that time also. *Defts' Ex.* C at ¶ 13.

Plaintiff was next seen by Dr. Hewitt on June 12, 2013. *Defts' Ex.* A-2 at 40. Dr. Hewitt diagnosed Plaintiff has having prostatitis[9] and epididymitis. *Id.* Dr. Hewitt prescribed bed rest as needed, a different antibiotic, ciprofloxacin, and Lorcet for the pain. *Id.* Plaintiff was to return in a month. *Id.* The Lorcet[10] prescription was not filled. *Id.* Instead, Plaintiff was continued on tramadol. *Defts' Ex.* A-5 at 161.

Plaintiff submitted medical requests on June 24th, June 29th, and July 2, 2013. *Defts' Ex.* A-2 at 43-46. In each, he was complaining about his swollen testicles and described the pain as being so bad it almost made him throw up. *Id.* In response to each request, he was told an appointment would be set up. *Id.*

---

[9] Inflammation of the prostate. http://www.medilexicon.com/dictionary/72873 (accessed May 17, 2017).

[10] Lorcet is the brand name for a combination product containing hyrocodone and acetaminophen. https://medlineplus.gov/druginfo/meds/a601006.html (accessed May 9, 2017).

AO72A
(Rev. 8/82)

Plaintiff was also seen at nurse call on June 26, 2013, complaining of pain in his testicles. *Defts' Ex.* A-4 at 156. Note was made that an appointment would be scheduled. *Id.* On July 5, 2013, Plaintiff was again seen at nurse call asking for a visit to the urologist. *Id.*

Plaintiff was seen by Dr. Hewitt on July 10, 2013. *Defts' Ex.* A-2 at 47; Doc. 83 at 11-12. Dr. Hewitt noted swelling and tenderness. *Id.* He prescribed another antibiotic, Cipro, and Lorcet for the pain. *Id.* He continued Plaintiff on Motrin and tramadol. *Id.* Plaintiff was to return in two weeks. *Id.* Again, the Lorcet prescription was not filled and Plaintiff was continued on tramadol. *Id.; see also Defts' Ex.* A-5 at 161. Indications for surgical correction were discussed. Doc. 83 at 12.

On July 24, 2013, Dr. Hewitt noted no significant improvement after the course of Cipro. *Defts' Ex.* A-2 at 47-48; Doc. 83 at 12-13.[11] Dr. Hewitt prescribed another antibiotic, Keflex, and tramadol for the pain. *Id.* Further, he continued Plaintiff on Motrin. *Id.* Dr. Hewitt noted that Plaintiff would probably need surgery. *Id.* Plaintiff was to return in three weeks to see Dr. Hewitt. *Id.*

On August 7, 2013, Plaintiff was again seen by Dr. Hewitt, who noted no significant improvement. *Defts' Ex.* A at 49; Doc. 83 at 13. Dr. Hewitt recommended out-patient surgery; specifically an epididymectomy.[12] *Id.* Plaintiff agreed. *Id.* Dr. Hewitt prescribed complete bed rest until surgery. *Id.* Dr. Hewitt indicated surgery should be scheduled in a week or two. Doc. 83 at 13.

---

[11]Defendants' Exhibit A-2 at 48 lists the date of the visit as July 22, 2013. However, Dr. Hewitt's records, Document 83 at 12-13, indicate the date was July 24, 2013.

[12]The operative removal of the epididymis. http://www.medilexicon.com/dictionary/29726 (accessed May 17, 2017).

AO72A
(Rev. 8/82)

This is the last time Plaintiff was seen by Dr. Hewitt. According to Nurse Watson, "[m]ultiple calls were made to Dr. Hewitt's office to determine" when surgery would be scheduled. *Defts' Ex.* C at ¶ 18. On August 26, 2013, a nurse reported the bookkeeper was concerned about payment for the surgery. *Id.* That same day, in responding to a request from the Plaintiff, Nurse Watson said the "delay in scheduling your surgery is being able to determine that you have resources to pay for the procedure." *Defts' Ex.* A-7 at 592. Nurse Watson sent a number of other responses to the Plaintiff indicating the problem with scheduling surgery was due to payment issues.[13] *Id.* at 595-599. As of September 18, 2013, Nurse Watson indicated they were still working with Dr. Hewitt's office. *Id.* at 636. On September 25, 2013, Nurse Watson stated that if they did not get an answer to their calls they would schedule Plaintiff with a different urologist. *Id.* at 671.

According to Nurse Watson, after discussion with Captain Guyll, "a letter was composed and signed by the Captain stating the BCSO [would] guarantee payment." *Defts' Ex.* C; *see also Defts' Ex.* A-4 at 157. This letter does not appear in the summary judgment record. Additionally, Nurse Watson does not in her affidavit indicate the date the letter was written on or sent to Dr. Hewitt's office. However, in her testimony taken on April 26, 2016, Nurse Watson testified that the letter was written and faxed to Dr. Hewitt's office on either August 26, 2013, or August 27, 2013. Doc. 88 at 44. Nurse Watson testified that she did not know if Dr. Hewitt's office was going to accept the letter. *Id.* at 51.

Nurse Watson testified that Dr. Lafferty was aware of the fact that Dr. Hewitt's office had not scheduled Plaintiff for surgery. Doc. at 71-72. Nurse Watson indicated she and Dr. Lafferty

---

[13]As of August 11, 2013, Plaintiff was being billed for visits to Dr. Hewitt. Doc. 54 at 7.

AO72A
(Rev. 8/82)

had an "ongoing conversation" about the situation and he told her to "just keep trying to get a hold of" Dr. Hewitt. *Id.* at 75. They continued the efforts because Dr. Hewitt had seen the Plaintiff several times and is the one who scheduled the surgery. *Id.* at 77. Nurse Watson testified that if they knew he was going to refuse to do the surgery, it would have "absolutely" been appropriate to contact Dr. Zimmerman sooner. *Id.*

Thereafter, Nurse Watson testified she was continually calling Dr. Hewitt's office in an effort to get an appointment for the surgery. Doc. 88 at 45. However, there is nothing documenting these efforts. *Id.* at 47. Nurse Watson testified that Dr. Hewitt's office was not being responsive and did not return her phone calls. *Id.* at 56-59. If she did get to speak to someone, she was given the "runaround." *Id.* at 75.

Nurse Watson testified it is "just difficult to get outside appointments for inmates." Doc. 88 at 60. She indicated it was an "ongoing problem" that a doctor's office "would initially . . . make the appointment and then cancel it or not follow through because they didn't want guys, guys or women, coming from the jail in shackles and ankle shackles because it scared their patients. . . It was an ongoing struggle if we were to send anybody on the outside." *Id.* at 73.

On October 4, 2013, a nurse noted that Dr. Hewitt's office was setting up the surgical date. *Defts' Ex.* A-4 at 158. On October 7, 2013, Plaintiff complained of problems urinating and of pain. *Id.* A note was made that an office appointment had been scheduled for that day. *Id.* Surgery had still not been scheduled. Doc. 88 at 46.

Nurse Watson asserts that on October 7, 2013, Dr. Hewitt's office "cancelled the appointment and did not want to treat . . . Morris any further." *Defts' Ex.* C at ¶ 28; Doc. 88 at

AO72A
(Rev. 8/82)

46. Despite this, Nurse Watson continued for several days to respond to Plaintiff's requests by stating she was working with Dr. Hewitt's office. Doc. 88 at 64-67.

After consulting Dr. Lafferty, efforts were made to locate a urologist to perform surgery for Plaintiff and see three other inmates with testicular issues. *Defts' Ex.* C at ¶ 28. Dr. Zimmerman agreed to see the inmates. *Id.* Nurse Watson testified that she "begged" them to see the Plaintiff. *Id.* at 73. She indicated she explained the whole story and said: "You've got to get him in. This is an emergency. We've got to get him taken care of." *Id.*

During the period of delay, Plaintiff testified he was having cold sweats; he was having difficulty urinating; he had light blood in his urine; and his testicles were painful and swollen although not nearly as swollen as when he began seeing Dr. Hewitt. Doc. 88 at 86. When asked if the delay in surgery had any long-term adverse affect on him, Plaintiff testified that in his opinion, the delay caused him to lose his left testicle. *Id.* Plaintiff conceded he was not a doctor and could not say for a fact that the outcome would have been different. *Id.*

Plaintiff was first seen by Dr. Zimmerman on October 18, 2013. *Defendants' Ex.* A-2 at 56-60. Dr. Zimmerman reviewed Dr. Hewitt's records and also spoke with him; prescribed antibiotics and pain medication; and indicated surgery, a bilateral epididymectomy and hydrocele repair, would need to be scheduled in coordination with Mercy Hospital Northwest Arkansas and only after confirmed payment arrangements had been made. *Id.*

On October 31, 2013, Dr. Zimmerman performed surgery on the Plaintiff. *Defts' Ex.* A-2 at 61-66. Plaintiff was discharged with prescriptions for ciprofloxacin and hydrocodone-acetaminophen, thirty tablets. *Id.* at 62. Plaintiff was also to place bacitracin ointment on the

-9-

incision areas and at drain sites several times a day after showering or voiding. *Id.* at 63. Plaintiff received daily wound care until his sutures were removed. *Defts' Ex.* C at ¶ 32.

On November 3, 2013, Plaintiff complained of swelling at the surgical site. *Defts' Ex.* A-4 at 159. He was given 400 mg of Ibuprofen and asked to tell the night nurse if that helped. *Id.*

On November 4, 2013, Plaintiff was seen at nurse call worried about the fact that he only had minimal drainage from the drain tubes. *Defts' Ex.* A-4 at 159. He asked for the cold packs more frequently. *Id.* Nurse Watson noted swelling in the testicles. *Id.* She indicated that treatment would focus on the use of cold packs. *Id.*

Plaintiff was next seen by Dr. Zimmerman on November 12, 2013. *Defts' Ex.* A-2 at 67-71. Plaintiff's sutures and drains were removed. *Id.* at 68 & 70. Note was made that Plaintiff should continue to use scrotal support. *Id.* at 71. Further, Dr. Zimmerman noted Plaintiff might need pain medication stronger than tramadol for the next one to two weeks. *Id.* Another appointment was scheduled for December 11, 2013. *Id.* at 67.

On November 14, 2013, Plaintiff was seen at nurse call. *Defts' Ex.* A-4 at 159. He had minimal discharge from the operation site. *Id.*

On November 20, 2013, Plaintiff was seen at nurse call. *Defts' Ex.* A-4 at 159. It was noted that the operation site was clean and the swelling had decreased. *Id.*

Plaintiff was not seen by Dr. Zimmerman on December 11, 2013. However, it is not clear from Plaintiff's medical records or from Nurse Watson's affidavit why Plaintiff did not go to this appointment.

-10-

The next time Plaintiff was seen by Dr. Zimmerman was on January 24, 2014. *Defts' Ex.* A-2 at 73-76. Plaintiff complained of pain in his left testicle. *Id.* at 73. Dr. Zimmerman noted the right side was remarkably improved. *Id.* Dr. Zimmerman believed Plaintiff's "complaints of tenderness to the left testicular area" were "a bit exaggerated though he does have a bit of residual inflammatory tissue from surgery." *Id.* at 75. Dr. Zimmerman concluded:

> a lot of his left pain is probably groin/inguinal in nature as he has had past hernia repair. I recommend continue observation and continuance of present plan. I have also explained the poor expectation of "cure" if inguinal in nature. Would not recommend any further surgical intervention at this point or change in our plan.

*Id.* at 76.[14] Plaintiff was prescribed Flomax for his urination problems. *Id.* at 79.

A urinalysis was performed. *Defts' Ex.* A-2 at 77. The results were negative. *Id.* at 75.

On April 9, 2014, Plaintiff wanted to see Dr. Zimmerman regarding "prostate problems" related to trouble starting his urinary stream. *Defts' Ex.* C at ¶ 46. Plaintiff reported that Dr. Zimmerman had indicated he would consider removing Plaintiff's left testicle. However, Dr. Zimmerman's office declined to see Plaintiff indicating it was not necessary and that Dr. Zimmerman did not plan for any further surgery. *Id.; see also Defts' Ex.* A-4 at 160.

On April 23, 2014,[15] Plaintiff was seen by Dr. Lafferty. *Defts' Ex.* A-5 at 162. Plaintiff complained of left testicular pain. *Id.* An antibiotic was prescribed as well as Ibuprofen for pain. *Id.*

---

[14] Plaintiff denies that he saw Dr. Zimmerman on this date. *Defts' Ex.* B at 25. However, Dr. Zimmerman's notes indicate he examined the Plaintiff. *See e.g., Defts' Ex.* A-2 at 75. Nurses notes also indicate Plaintiff was transported to the appointment. *Defts' Ex.* A-4 at160.

[15] It is not clear from the physician's progress notes if this date was April 13th or April 23rd. *See Defts' Ex.* A-5 at 162. However, in her affidavit, Nurse Watson lists the date as April 23, 2014. *See Defts' Ex.* C at ¶ 47.

AO72A
(Rev. 8/82)

On May 12, 2014, Dr. Lafferty ordered a referral to urology due to Plaintiff's complaints of increased testicular pain. *Defts' Ex.* C at ¶ 48; *Defts' Ex.* A-5 at 165. As noted above, Plaintiff was released to the ADC on May 20, 2014. *Defts' Ex.* B at 88.

While at the BCDC, Plaintiff also sought medical treatment for a number of conditions unrelated to his testicular swelling including: April 12, 2013, neck and back pain; April 18, 2013, for hemorrhoids and neck and back pain; May 4, 2013, for complaints of mid-sternum pain and left arm and hand tingling; May 14, 2013, for pain in chest and arm as well as an upset stomach; July 23, 2013, problems with stomach, bowels, and burning in his throat; August 6, 2013, stomach pain and nausea; August 13, 2013, for hemorrhoids and constipation; August 23, 2013, continued complaints of stomach pain; September 5, 2013, following a fall for injury to his right shoulder and ringing in his ears; September 7, 2013, continued soreness in the shoulder and ringing in the ears; September 24, 2013, continued ringing in his ears; September 27, 2013, for continued complaints of constipation; October 4th and 7th, 2013, for complaints of problems urinating possibly related to his prostate; October 28, 2013, complaining of stomach issues; November 20, 2013, complaints of continued constipation; November 27, 2013, complaints of stomach pain, nausea, and diarrhea; December 2, 2013, for complaints of stomach pain; December 8, 2013, complaining of a headache and sweats; December 10, 2013, stomach pain and diarrhea; December 17, 2013, for treatment of stomach complaints; January 30, 2014, complaining of cold symptoms and sinus congestion; and on February 21, 2014, for pain in the kidneys. *Defts' Exs.* A-4, A-5, & A-7.

By affidavit, Sheriff Cradduck states: "I have not been personally involved in any of the incidents referenced in the Plaintiff's complaint." *Defts' Ex.* D at ¶ 4. He asserts that "[a]ll

-12-

medical care decisions are made by medically trained personnel, without consultation with me." *Id.* at ¶ 5. He was not "familiar with the Plaintiff's medical care while he was incarcerated" in the BCDC. *Id.* at ¶ 6.

Plaintiff submitted portions of Sheriff Cradduck's deposition. Doc. 98-1. Sheriff Cradduck testified he was in office from 2014 to 2016.[16] *Id.* at 6.[17] He testified he encouraged medical personnel to arrange for an inmate to see someone outside the jail for medical treatment when they believed it was appropriate or necessary. *Id.* at 13.

Sheriff Cradduck testified that on two occasions he had Nurse Watson's supervisor, Rob Holly, speak to her about the decisions she was making that he felt "should have been dealt with in a different way because it's not her job to worry about the budget." Doc. 98-1 at 18. He testified it was his job to worry about the budget and her job to "diagnose, you know, some ailments. But also, if not, send them to the hospital." *Id.* He testified that Nurse Watson never said she was making medical decisions based upon budget considerations. *Id.* However, he testified it was part of her job to determine or recognize which inmates needed medical treatment and which inmates just wanted to kill time, try to escape, or meet their girlfriends. *Id.* at 19. Sheriff Cradduck testified he had to rely on medical personnel to make sound decisions but that he encouraged them to be safe rather than sorry. *Id.* at 20.

After his transfer to the ADC, Plaintiff underwent a second surgery to remove his left testicle. *Defts' Ex.* B at 29-31. Dr. Robert Emery performed the surgery. *Id.* at 30.

---

[16]Sheriff Cradduck testified that he did not take office until 2014. Doc. 98-1 at 6. This date, obviously, is well after the date on which Plaintiff had surgery. However, documents in the court's electronic database, CM/ECF, indicate Sheriff Cradduck was named as a Defendant in cases filed before January of 2014. *See e.g., Adams v. Cradduck*, Civil No. 13-5074 filed April 9, 2013.

[17]Page references are to the deposition page numbers not the CM/ECF page numbers.

AO72A
(Rev. 8/82)

By affidavit, Dr. Emery states he first saw Plaintiff in August of 2014 for complaints of pain in his left testicle. *Defts' Ex.* E at ¶ 9. On October 28, 2014, Dr. Emery surgically removed Plaintiff's left testicle due to chronic testicular pain. *Id.* at ¶ 10. With respect to the delay in scheduling the first surgery, Dr. Emery states: [b]ecause there was no sign of infection or cancer at the time of either surgery, I do not feel that this delay had any long term negative effects, nor do I feel that the delay was the cause of Mr. Morris' continued pain or his ultimately requiring another operation." *Id.* at ¶ 11.

### 3. Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." National Bank of Commerce v. Dow Chemical Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." Id. (citing, Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985)).

AO72A
(Rev. 8/82)

## 4. Discussion

Defendants have moved for summary judgment on the following grounds: (1) Sheriff Cradduck had no personal involvement with the Plaintiff and made no decisions regarding his treatment; (2) there was no deliberate indifference on the part of the Defendants; (3) at most, Defendants were negligent and negligence does not state a cognizable claim; (4) Defendants are entitled to qualified immunity; (5) there is no basis for official capacity liability; and (6) there is no basis for an award of punitive damages.

### (A). Section 1983 Liability

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution. West v. Atkins, 487 U.S. 42 (1988); Dunham v. Wadley, 195 F.3d 1007, 1009 (8th Cir.1999). The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. Daniels v. Williams, 474 U.S. 327 (1986); Davidson v. Cannon, 474 U.S. 344 (1986).

### (B). Denial of Medical Care

The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claim of inadequate medical care under the deliberate indifference standard. See Butler v. Fletcher, 465 F.3d 340, 344 (8th Cir. 2006). To prevail on an Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an

-15-

objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the [officers] actually knew of but deliberately disregarded those needs.'" Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir.1997)).

In order to show he suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Schaub v. VonWald, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." Popoalii v. Correctional Medical Services, 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted).

There is no dispute in this case that the Plaintiff had a serious medical need that necessitated treatment and ultimately surgery. Instead, the gravamen of the case is whether the delay in surgery from when Dr. Hewitt indicated the surgery should be scheduled, August 7, 2013, until surgery was performed by Dr. Zimmerman, on October 31, 2013, constitutes deliberate indifference on the part of the Defendants.

-16-

### (C).  Individual Capacity Claim Against Sheriff Cradduck

With respect to Sheriff Cradduck, I believe there are no genuine issues of material fact as to whether he, in his individual capacity, exhibited deliberate indifference to the Plaintiff's serious medical need.  A claim of deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability.  See Monell v. Department of Social Services, 436 U.S. 654, 694 (1978).  "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." White v. Holmes, 21 F.3d 277, 280 (8th Cir. 1994); see also Whitson v. Stone County Jail, 602 F.3d 920, 928 (8th Cir. 2010) ("In a § 1983 case, an official is only liable for his own misconduct and is not accountable for the misdeeds of his agents under a theory such as respondeat superior or supervisor liability") (internal quotations omitted); Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997) ("general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability").

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.  To establish personal liability of the supervisory defendant, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." Clemmons v. Armontrout, 477 F.3d 962, 967 (8th Cir. 2007) (quoting Mayorga v. Missouri, 442 F.3d 1128, 1132 (8th Cir. 2006)); Keeper, 130 F.3d at 1314 (no evidence that the defendants were doctors or were personally involved in making medical decisions about treatment); Mark v. Nix, 983 F.2d 138, 139-40 (8th Cir. 1993) (section 1983 liability requires some personal involvement or responsibility).

-17-

Here, there is no evidence in the record suggesting Sheriff Cradduck was personally involved in anyway in determining what medical treatment should be given the Plaintiff, when the medical treatment should be provided, or if the surgery should be paid for by Benton County. Sheriff Cradduck is entitled to summary judgment on the individual capacity claim.

### (D).  Official Capacity Liability

Sheriff Cradduck may be held liable in his official capacity if a policy or custom of Benton County was the moving force behind the alleged constitutional violation.  A Plaintiff "seeking to impose liability on a municipality under § 1983 [must] identify a municipal policy or custom that caused the plaintiff's injury." Board of County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 403 (1997).  "There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences." Moyle v. Anderson, 571 F.3d 814, 817-18 (8th Cir. 2009) (citation omitted); Jenkins v. County of Hennepin, 557 F.3d 628, 633 (8th Cir. 2009)(Plaintiff must point to "any officially accepted guiding principle or procedure that was constitutionally inadequate."

Sheriff Cradduck argues that other than the fact that there was a delay in Plaintiff undergoing surgery, there is nothing establishing this was due to any custom, policy, or practice of Benton County.  In fact, the evidence indicates that Nurse Watson was counseled on at least two occasions that monetary concerns should not enter into the decision as to what medical treatment should be provided to inmates.  There is no evidence of any policy, practice, or custom

-18-

of Benton County that caused the delay. Defendants are entitled to summary judgment on the official capacity claims.

### (E). Individual Capacity Claim Against Nurse Watson

While delay in the provision of medical treatment can constitute deliberate indifference, it is also true that prisoners are not entitled to have every medical complaint handled as quickly as they might wish. See e.g., Jenkins v. City of Hennepin, Minn., 557 F.3d 628, 633 (8th Cir. 2009). Delays in the scheduling of surgery are sometimes evaluated in terms of whether or not the surgery at issue is regarded as elective or not. See e.g., Johnson v. Bowers, 884 F.2d 1053, 1056 (8th Cir. 1989)(long delay in scheduling elective surgery to repair nerve damage in inmate's arm that results in restriction in use of arm constitutes deliberate indifference); Baker v. Wilkinson, 635 F. Supp. 2d 514, 520-21 (W.D. La. 2009)(four year delay in elective surgery for hemorrhoids); West v. Keve, 541 F. Supp. 534, 540 (D. Del. 1982)(seventeen month delay between recommendation and performance of elective surgery for deliberate indifference). In this case, no one has suggested the surgery was considered elective. I will therefore proceed with the assumption that the surgery constituted necessary medical care.

It is well settled that a "prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." Nelson v. Shuffman, 603 F.3d 439, 449 (8th Cir. 2010) (internal quotation marks and citations omitted). "Treatment may violate the Eighth Amendment only if it involves something more than a medical judgment call, an accident, or an inadvertent failure to give medical care. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Starbeck v. Linn County Jail, 871 F. Supp. 2d 1129, 1144 (N.D. Iowa 1994). An

-19-

"inmate must clear a substantial evidentiary threshold to show the prison's . . . staff deliberately disregarded the inmate's needs by administering inadequate treatment." Nelson, 603 F.3d at 449.

"Deliberate indifference to serious medical needs may be shown by . . . delaying necessary medical treatment for nonmedical reasons." Thomas v. Town of Davie, 847 F.2d 771, 772-773 (11th Cir. 1988). In this case the delay was due in large part to scheduling problems. It is somewhat troubling that Nurse Watson failed to attempt to scheduled the surgery with another urologist when her communications with Dr. Hewitt's office were not being returned and no surgery date had been scheduled. However, Dr. Hewitt had treated Plaintiff on several occasions and was the doctor who recommended surgery and said it should be scheduled. Nurse Watson testified the jail responded to concerns voiced by the bookkeeper regarding payment by submitting a letter guaranteeing payment. While the letter is not part of the record, Nurse Watson testified it had been written after consultation with Captain Guyll. See Davis v. First Corr. Med., 589 F. Supp. 2d 464, 470 (D. Del. 2008)("While there may have been a delay in surgery due to diagnostic testing and scheduling, such a delay does not constitute deliberate indifference to plaintiff's medical condition, particularly when there is no indication any delay was intentional").

Nurse Watson also testified that Dr. Hewitt and Dr. Zimmerman were the only two urologists that would see inmates. Nurse Watson testified that getting inmates seen by outside medical professional was a challenge as many did not want an inmate to be present when other patients were there. It would be naive of the Court to believe obstacles do not exist in scheduling outside medical treatment for prisoners.

-20-

Once Nurse Watson knew that Dr. Hewitt would not be performing the surgery and no longer wished to see the Plaintiff, she arranged for Plaintiff to be seen by Dr. Zimmerman and the surgery was scheduled and performed. There is no suggestion that she intentionally delayed scheduling the surgery or postponed the surgery due to monetary concerns.

Further, "[a] prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials 'ignored an acute or escalating situation or that [these] delays adversely affected his prognosis.'" Holden v. Hirner, 663 F.3d 336, 342 (8th Cir. 2011) (quoting Reece v. Groose, 60 F.3d 487, 491 (8th Cir. 1995)). Here, there is no medical evidence to suggest the delay had a detrimental effect on the Plaintiff's condition. In fact, Dr. Emery states the delay had no detrimental effect. While Plaintiff may have experienced pain during the delay, he was given pain medication.

There is no suggestion that the delay in scheduling the surgery constitutes a deviation from professional standards so as to amount to deliberate indifference. Under the circumstances of this case, I conclude there are no genuine issues of fact as to whether the delay in scheduling the surgery, once it was recommended, constitutes deliberate indifference. Nurse Watson is entitled to summary judgment in her favor.

### (F).  Qualified Immunity

Having found that the facts do not make out a constitutional violation, Defendants are entitled to qualified immunity. See, e.g., Krout v. Goemmer, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the defendant is entitled to qualified immunity).

AO72A
(Rev. 8/82)

### 5.  Conclusion

For the reasons stated, I recommend that Defendants' motion for summary judgment (Doc. 93) be **GRANTED** and the case **DISMISSED WITH PREJUDICE.**

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 18th day of May 2017.

/s/ *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)